UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES

        -against-                                       21 CR 603 (VEC)

SEBASTIAN TELFAIR
-------------------------------------------------------x

## SEBASTIAN TELFAIR'S
## SENTENCING MEMORANDUM

 

Deborah Colson
Moskowitz Colson Ginsberg & Schulman LLP
80 Broad Street, Suite 1900
New York, N.Y. 10004
*Attorney for Sebastian Telfair*

I.

INTRODUCTION

Sebastian Telfair rose to fame as one of the most brilliant high school basketball players New York City has ever seen and was the first point guard in NBA history to be drafted straight from high school. Yet in 2018—fourteen years after his NBA journey began—Mr. Telfair returned to live in Surfside Gardens, the low-income housing development on Coney Island where he grew up. A 2017 arrest for gun possession had brought his basketball career to a screeching halt, nearly robbed him of his sanity, and cost him thousands of dollars in legal fees, precipitating his involvement in the instant offense.

Mr. Telfair was convicted of the gun charge in August 2019 and sentenced to 42 months' imprisonment, but the New York Court of Appeals overturned his conviction and ordered a new trial on November 21, 2023. When he pled guilty before this Court in March 2023, he explained that he had committed the federal offense while "fighting for [his] life" after being "accused of a [state] crime that [he] didn't commit." Dkt No. 861, 18:9-10 (March 15, 2023). With his new state trial pending, Mr. Telfair is still fighting in court, but these days his primary focus is his girlfriend and their two-year-old twins.

A probationary sentence is sufficient to satisfy the goals of sentencing and necessary to avoid unwarranted disparities among similarly situated defendants. Mr. Telfair accepts full responsibility for his offense, has not had trouble with the law during more than two years on pretrial release, and plays a vital role in caring for his children. In addition, the Court has already imposed below guidelines, time-served sentences on other similarly situated defendants.

II.

**THE SENTENCING GUIDELINES**

When Mr. Telfair pled guilty in March 2023, the parties stipulated to a total offense level of 16 and a criminal history category of II, with the understanding that Mr. Telfair's criminal history category could change depending on the outcome of his state appeal. Because the state conviction was vacated last November, Mr. Telfair now belongs in criminal history category I. In addition, as a zero-point offender, he is entitled to a two-point offense level reduction under Guideline ¶ 4C1.1, reducing his total offense level from 16 to 14. Taking these changes into account, Mr. Telfair's new advisory guidelines range is 15 to 21 months.

III.

**PERSONAL HISTORY AND OFFENSE CONDUCT**

When Mr. Telfair was a newborn, his father, Sylvester, was convicted of manslaughter and sent to prison for eight years. PSR ¶ 191. While his father was incarcerated, Mr. Telfair's mother, Erika, took charge of their ten children, along with five of her nieces and nephews. All fifteen children lived under the same roof where they slept three and four to a bedroom on mattresses strewn over crates. *Id.* Erika struggled to feed and clothe such a large family by herself, and food was limited, especially when her SNAP benefits ran out late in the month. *Id.* Watching his mother struggle, Mr. Telfair made it his personal goal to lift his family out of Surfside Gardens, and he believed that basketball was the answer. Told at age ten that he was the best player in his age group, he began practicing for hours each day on the courts outside his building under the close watch of his coach and older brother, Dan.

2

Mr. Telfair's break came in the eighth grade when one of the players at an elite summer camp failed to show, and Mr. Telfair's coach agreed to let him sub in. Still lanky and then just 5'9", Mr. Telfair "spent the week running circles around players bigger and stronger than him." Yaron Weitzman, *Broken Hoop Dreams: Where Did it Go Wrong for Former Phenom Sebastian Telfair?*, Bleacher Report (Aug. 30, 2017) (hereinafter "Broken Hoop Dreams"). "In one game, he even found himself matched up against a 6'6" freshman point guard from Akron, Ohio, named LeBron James. Telfair held his own, though, never backing down, never afraid to attack, never doubting that he belonged." *Id.*

Over the next four years, Mr. Telfair's talent, charm, and evident love for the game continued to attract attention, and he relished the spotlight as he led his high school team to three city titles and traveled the country playing in showcases and all-star games. He was featured on the cover of Sports Illustrated and Slam Magazine and was the subject of a documentary that continues to inspire young players today. *Through the Fire* (ESPN, Cinema Libre Acquisitions Inc. 2005). His games drew celebrities, college recruiters, and NBA scouts. And when he finished high school, he was named Mr. Basketball USA. He also graduated as the all-time highest high school scorer in New York. Jeff Mezydlo, *New York City's All-Time Greatest High School Basketball Players.* YardBarker (Updated Jan. 4, 2024).

In his senior year, Mr. Telfair committed to playing college ball at the University of Louisville. Weeks later, however, he changed his mind and decided to enter the NBA draft. Mr. Telfair had grown up in the shadow of his older cousin, Stephon Marbury, a two-time All-Star and two-time member of the All-NBA team. He had watched as Marbury bought his mother a house and car and wished that he, too, could achieve such success. A fatal shooting in the hallway of Mr. Telfair's apartment building during his senior year of high school fueled his

3

resolve. "I know I can handle living there, but I don't know about my family," he told Sports Illustrated in 2004. Peter Bukowski, *Burned by the Fire: The Story of Sebastian Telfair,* Bleacher Report (July 5, 2008). "I've seen more friends killed than I can count. I don't want to put my family through that much longer." *Id.*

Mr. Telfair's mother, Erika, questioned his decision to enter the draft. Years earlier, her older son Jamel had been passed over by the NBA after being told he was a top pick. But Jamel's disappointment only drove Mr. Telfair to work harder as he remained confident that basketball guaranteed his family a better future. To his family's delight, in June 2004, Mr. Telfair was picked thirteenth overall by the Portland Trail Blazers. Barely nineteen at the time, he received a two-year, $5 million contract from the NBA and a six-year, $15 million shoe deal from Adidas. PSR ¶ 227.

When Mr. Telfair got to the NBA, he faced a steep learning curve. "They really don't teach you how to play basketball, especially in a public school," Telfair later explained. Ian Thomsen, *Former phenom Sebastian Telfair reflects on what could have been,* Sports Illustrated (March 14, 2013). "When I got to Portland … [i]t was a big man's league and I didn't understand how to play with those guys." *Id.*

Mr. Telfair's inexperience was just one issue. His youth and lack of support from the NBA were others. Most of Mr. Telfair's teammates had no interest in mentoring him, likely because of the publicity he received upon entering the NBA. "Given all the hype coming in, Sebastian definitely had some teammates who looked at him differently," explained the Portland coach, Nate McMillan. *Broken Hoop Dreams.* And the NBA itself did nothing to help him integrate. "The NBA wasn't really set up for 19-year-olds at that time," said McMillan. *Id.* "There were no team-provided meals, no personnel to help kids like Telfair, someone forced to

4

move 3,000 miles from home while his mother stayed back in Brooklyn to care for Telfair's sick dad." *Id.* In 2006, two years after Mr. Telfair joined the NBA, it did away with the high school draft, making him one of the last players to enter the league with no college experience. To be eligible now, players must be at least one year removed from high school. Jasmyn Wimbish, *NBA, NPBA unlikely to lower minimum draft age despite previous momentum, per report*, CBS (March 31, 2023).

In 2005, a year after moving to Portland, Mr. Telfair met and married his ex-wife, Samantha Rodriguez. They went on to have two children, Samaya and Sebastian, now teenagers. PSR ¶¶ 197-98. Mr. Telfair was traded several times when his kids were young, pulling him away from his family and putting a strain on his marriage. Then, in 2007, while playing for the Boston Celtics, he was arrested for possession of a weapon, sparking controversy in the NBA and exacerbating the tension with his wife. *Id.* at ¶ 171. Ultimately, he received a sentence of probation, but shortly after his arrest, the Celtics traded him to the Minnesota Timberwolves. Worse still, Adidas ripped up his advertising deal, costing him millions of dollars in future earnings because of one poor decision.

The average career for an NBA player lasts four and a half years. Roberth Perez, *9 NBA Players Who Played In The League The Longest,* The Sportswriter (Nov. 1, 2023). Mr. Telfair played ten seasons and earned over $19 million, much of which he shared with his family and community. Yet despite his obvious success, he believes that his NBA career ended prematurely. In 2014, Mr. Telfair was released from the Oklahoma City Thunder 16 games into the season. PSR ¶ 232. Immediately thereafter, he signed a contract with the Xinjiang Flying Tigers and played the rest of the season in China. *Id.* at ¶ 233. He signed another, more lucrative contract with the Fujian Sturgeons in 2016. *Id.* at ¶ 234.

Unfortunately, Mr. Telfair's work in China came to an abrupt halt the following July. Back in the States between seasons, he was pulled over while driving in Brooklyn for making an illegal U-turn. *People v. Telfair,* 2023 WL 8039633, at *1 (2023). As police officers approached Mr. Telfair's truck, they claimed to smell marijuana and said they saw a lit marijuana cigarette on the center console. *Id.* Officers arrested Mr. Telfair and transported him to the precinct, where they conducted an inventory search of the truck and recovered four firearms. *Id.* Subsequently, the Brooklyn District Attorney's office charged him with weapons possession and ammunition offenses. *Id.*

Mr. Telfair's 2017 arrest completely upended his life. He had purchased the guns legally while living in Florida, and they were properly registered to his name. *Id.* at *2. He also had a strong legal argument that the officers had no basis for the traffic stop. As such, he was determined to litigate, but as the case proceeded, he accumulated thousands of dollars in legal fees he could not afford. His bank and retirement accounts were frozen in connection with his divorce, and he could not fulfill his contract in China because he had surrendered his passport when he was released on bail. He was just 32 years old with years of play ahead of him, but without a passport, his basketball career was defunct. So Mr. Telfair had no choice but to return to Surfside Gardens, the housing development he had fought tooth and nail to escape.

This was Mr. Telfair's predicament when Terrence Williams approached him about the instant offense. Mr. Telfair knew that submitting false reimbursement claims was against the law. "I know how accounts work," he explained during his guilty plea. *See* Guilty Plea Tr., Dkt No. 861, at 19:2 (March 15, 2023). "I just caught myself in a really bad situation that I was fighting for and that I'm still fighting for that I soon … hope will be over." *Id.* at 19:2-4. At the time, Mr. Telfair rationalized that he had earned the money himself and was not harming anyone by using

6

it to pay his lawyers. At his plea, however, he acknowledged "that the accounts [we]re … not for legal fees." *Id.* at 19:5-6. He reiterated his remorse during his Presentence Interview, stating that he was "embarrassed by [his] actions and for putting [him]self and his family through this." PSR ¶ 157. He also said that he "wish[ed] [he] could undo [his] mistake" and that going forward, he will "think three times before doing anything." *Id.* In short, Mr. Telfair strongly regrets taking the money, and he is committed to paying full restitution.

The last several years have been among the most challenging in Mr. Telfair's life. His brother Dan died of COVID-19 in March 2020. His mother got sick a month later and died, too. PSR ¶¶ 188-89. In 2021—while still reeling from his mother and brother's deaths—Mr. Telfair learned that his girlfriend, Krissy Porter, was pregnant with twins. The twins were born in early 2022, just three months after Mr. Telfair's arrest for the instant offense. Ms. Porter already had two children from a prior relationship, so she and Mr. Telfair suddenly became a family of six.

Mr. Telfair acknowledges that he was not ready for court-ordered mental health treatment at the outset of this case and strongly regrets his early outbursts with Pretrial Services. At the time, he and Ms. Porter had no help with their newborns, and they were both sleep deprived. In recent months, Mr. Telfair has made a concerted effort to get the support he needs. His supervising Pretrial Services officer recently told counsel that he is reporting to her as directed and that his attitude has dramatically improved. Since February 2023, Mr. Telfair has also been participating in weekly therapy and substance use treatment with Anthony Weiss at St. Mark's Place Institute for Mental Health. PSR ¶ 213. He has a positive relationship with Counselor Weiss and appreciates the ongoing guidance and support. Ms. Porter writes that "therapy has changed Sebastian's perspective on life. He has a more positive outlook, he is more

7

understanding, and he is forthcoming with his mistakes." Ex. A. *See also* Ex B (letter from Sherry Gotay).

As an NBA player, Mr. Telfair donated hundreds of thousands of dollars to public schools in Brooklyn, including his alma mater, Lincoln High School. PSR ¶ 224. On three occasions, he also helped to renovate the basketball courts on Coney Island, where he learned to play. Ex. C. "Throughout his younger years, through today," writes Andre Iguodala, Acting Executive Director of the National Basketball Players Association, Mr. Telfair "has shown a strong connection to his Brooklyn community and a real desire to make a meaningful and lasting impact." Ex. D. When his state case is behind him, Mr. Telfair hopes to continue working in his community, coaching basketball and counseling teenagers. Given his experience, he has a lot to offer.

## IV.

## MR. TELFAIR MERITS A SENTENCE OF TIME SERVED

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). This provision, known as the parsimony clause, applies at every federal sentencing "except as otherwise specifically provided." 18 U.S.C. § 3551(a). Indeed, the command of the parsimony clause defines this Court's "overarching duty." *Pepper v. United States*, 131 S.Ct. 1229, 1243 (2011).

Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence of criminal

conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper,* 131 S.Ct. at 1240 (quoting *Koon v. United* States, 518 U.S. 81, 113 (1996)). While the guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States,* 128 S.Ct. 586, 596-97 (2007). Rather, the judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id*. at 597.

Multiple factors warrant leniency here.

<u>First</u>, Mr. Telfair is among a small minority of basketball players with the discipline and fortitude to channel his talent into a professional basketball career. He did so despite a difficult childhood marked by poverty and parental imprisonment. His resilience in the face of adversity demonstrates both a willingness and ability to live a productive, law-abiding life.

<u>Second</u>, Mr. Telfair played a limited role in the conspiracy. He did not conceive of or organize the scheme, did not recruit others, and had no knowledge of the scope of the fraud or number of people involved. He submitted false invoices under the guidance of Terrence Williams to collect money from his own health benefits account. He did not take money from others and did not pay kickbacks.

<u>Third</u>, Mr. Telfair does not present a recidivism risk as he has no history of theft or fraud. The circumstances surrounding his offense were unique and unlikely to reoccur. He did not act

9

out of greed; rather, he made an error in judgment during a period of personal crisis and now seriously regrets that decision.

Fourth, a probationary sentence is necessary to avoid unwarranted disparities in sentencing. The Court has already imposed below guidelines, time-served sentences on other similarly situated participant defendants, including those whose loss amounts were close to or greater than Mr. Telfair's. *See* PSR ¶ 148 (Shannon Brown's loss was $320,000); Dkt No. 1067 (Oct. 10, 2023), at 2 (Darius Miles' loss was $380,328).

Fifth, it goes without saying that a sentence of imprisonment would seriously impact Mr. Telfair's girlfriend and children. "[P]arental incarceration is now recognized as an 'adverse childhood experience' (ACE) of the type that can significantly increase the likelihood of long-term negative outcomes for children." The Osborne Association, *A Call to Action: Safeguarding New York's Children of Incarcerated Parents*, at 12 (May 2011); *see id.* ("[R]esearch suggests that parental imprisonment more often intensifies and compounds, rather than alleviates, the challenges children face."). Indeed, "[c]ompared to other children, those who experience parental incarceration suffer impairments across four domains of wellbeing: behavior, education, health, and hardship and deprivation." Kristin Turney and Rebecca Goodsell, *Parental Incarceration and Children's Wellbeing, The Future of Children*, Vol. 28, No. 1, Reducing Justice System Inequality, at 148 (Spring 2018).

Mr. Telfair's father was incarcerated for eight years when he was a child, during which his family suffered financially and emotionally. Now a father himself, Mr. Telfair is determined to give his children what he lacked. "He is here day in and day out for the twins since birth," writes Ms. Porter. Ex. A. "He takes the two big kids age[s] 10 and 9 to and from school and goes to their school meetings as well as extra-curricular activit[ies] they are in after school." *Id.* "He

moved my sister out of my mom's house and completely took on the role a being a father," adds Ms. Porter's sister Keyonna. Ex. E. "Not only has he provided for her and her kids but also me as well." *Id.* Sending Mr. Telfair to prison now would expose his twins to the same hardships he experienced. This factor alone warrants the Court's serious consideration.

<u>Sixth</u>, Mr. Telfair is unlikely to receive needed counseling in prison. A 2018 report by the Marshall Project found that while twenty-three percent of federal prisoners are diagnosed with mental health issues, only three percent are deemed ill enough to receive treatment. *Treatment Denied: The Mental Health Crisis in Federal Prisons,* The Marshall Project (Nov. 21, 2018). Mr. Telfair has only recently begun to understand the benefits of therapy, and a sentence of imprisonment would interrupt and likely reverse the progress he has made.

<u>Finally</u>, a probationary sentence is sufficient to meet the goal of general deterrence. The empirical research clearly shows that increases in punishment do not yield substantial deterrent effects. "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." National Institute of Justice, DOJ Office of Justice Programs, *Five Things About Deterrence* (May 2016); *see also* The Pew Charitable Trusts, *Time Served-The High Cost, Low Return of Longer Prison Terms* (June 2012)*,* at 4 ("For a substantial number of offenders, there is little or no evidence that keeping them locked up longer prevents additional crime."); Sentencing Advisory Council, *Does Imprisonment Deter? A Review of the Evidence* (Apr. 2011), at 14 ("increases in punishment levels do not routinely reduce crime through general deterrence mechanisms."). "[T]he chance of being caught is a vastly more effective deterrent than even draconian punishment." *Five Things About Deterrence.*

Given Mr. Telfair's celebrity, the government is more likely to achieve general deterrence by publicizing his conviction than by sending him to prison. Indeed, as the Court is no doubt aware, there has already been substantial publicity surrounding this case, such that any would-be criminals amenable to deterrence have probably already been deterred.

## V.

## CONCLUSION

For the above reasons, we respectfully request a sentence of probation.

New York, N.Y.
January 12, 2024